

# In the Court of Criminal Appeals of Texas

No. WR-77,940-03

### EX PARTE TOMAS RAUL GALLO,

*Applicant*

On Application for Writ of Habeas Corpus
In Cause No. 940093-C
In the 182nd Criminal District Court
Harris County

YEARY, J., filed a dissenting opinion in which KELLER, P.J., joined.

Once again, in a subsequent post-conviction application for the writ of habeas corpus raising a claim based on *Atkins v. Virginia*, 536 U.S. 304 (2002), the Court grants relief to a death-sentenced defendant—by unilaterally reforming his death sentence to a life sentence—without taking adequate account of the continually evolving

standards for diagnosing intellectual disability (hereafter "ID," formerly called "mental retardation") or the history and current procedural posture of the case. The Court does this based on its own independent determination that Applicant suffers from ID. And, since Applicant committed his capital crime before the advent of life *without* parole, the Court reforms his death sentence to a sentence of life *with* parole.

Once again, I am compelled to observe that the Court's approach to this and similar cases is problematic. In making the determination that Applicant suffers from ID, the Court only applies the *most recent* diagnostic manual, the American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (2022) (hereinafter, DSM-5-TR), without even questioning whether the criteria announced there actually defines the true threshold for immunity from the death penalty under the Eighth Amendment of the United States Constitution. Also, it measures Applicant's evidence only by the *very forgiving* preponderance of the evidence standard, without any recognition of how anomalous it is to unilaterally grant relief on such a low threshold of proof given the history and procedural posture of this case.

Once again, therefore, I am obliged to register my dissent.

## I. HISTORY AND PROCEDURAL POSTURE

The United States Supreme Court decided *Atkins* in 2002, in which it prohibited the states from executing capital offenders who were (under the then-current terminology) mentally retarded at the time they committed their offenses. In doing so, the Supreme Court referenced the diagnostic criteria for mental retardation contained in the version of the

DSM that was current at that time: the DSM-IV-TR. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (2000). 536 U.S. at 308 n.3.[1] Applicant was tried for this capital offense in 2004, nearly two years after *Atkins* was decided, but while the DSM-IV-TR was still the current diagnostic manual. And indeed, Applicant litigated the issue of his mental retardation during his 2004 trial. The jury found that he was *not* mentally retarded and, in the face of Applicant's claim that the jury's finding was against the great weight and preponderance of the evidence, this Court upheld that finding on direct appeal, in September of 2007. *Gallo v. State*, 239 S.W.3d 757, 769−75 (Tex. Crim. App. 2007).

While the direct appeal was pending, Applicant filed his initial post-conviction application for writ of habeas corpus, in March of 2007. In his initial writ application, Applicant did not attempt to relitigate the merits of his claim of ID. The most that he can be said to have done to challenge the determination that he is not ID is that he may have once again challenged *the jury's verdict* against him at trial with regard to that question as having been against the great weight and preponderance of the trial evidence.[2] To the extent that he might have

---

[1] In describing the diagnostic criteria for mental retardation then extant, in footnote 3 of *Atkins*, the Supreme Court seemed to identify the manual as the DSM-IV, rather than the DSM-IV-TR. But at the same time, in his opinion for the Court, Justice Stevens gave the copyright date for the manual as 2000, which corresponds to the DSM-IV-TR. It makes sense that Justice Stevens would invoke the version of the manual most recent in time to his opinion in 2002. The DSM-IV copyright date, by contrast, is 1994.

[2] In a concurring statement, Judge Price took the position that Applicant was not really challenging the jury's finding on that basis. *See Ex parte Gallo*, No. WR-77,940-01, 2013 WL 105277, at *3 (Tex. Crim. App. Jan.

been reiterating that claim from his direct appeal, this Court rejected it because it had already been raised and rejected on direct appeal. *Ex parte Gallo*, No. WR-77,940-01, 2013 WL 105277, at *1 (Tex. Crim. App. Jan. 9, 2013) (per curiam order, not designated for publication).

Shortly after the Court's per curiam order denying Applicant relief on his initial post-conviction writ application, his state-appointed initial writ counsel attempted to file a subsequent writ application on his behalf. *Ex parte Gallo*, No. WR-77,940-02, 2013 WL 3251436 (Tex. Crim. App. June 26, 2013) (not designated for publication). Counsel argued in that pleading that the trial testimony of Dr. George Denkowski relating to the issue of Applicant's ID was false. However, concluding that initial state-appointed counsel had not obtained Applicant's permission to file that first subsequent writ, the Court dismissed the application. *Ex parte Gallo*, 448 S.W.3d 1, 6 (Tex. Crim. App. 2014).

---

9, 2013) (Price, J., concurring) (not designated for publication) ("I agree that the applicant is not entitled to relief on his first claim, but not because it amounts to a renewed sufficiency of the evidence claim."). Instead, Judge Price believed that what Applicant was really challenging in his first claim was the admissibility of Dr. George Denkowski's trial testimony—as a predicate for alleging, in his second and third claims, that his trial and appellate counsel had been constitutionally ineffective in failing to likewise challenge the admissibility of Denkowski's trial testimony. *Id.* In any event, my point is that neither the Court nor Judge Price construed Applicant's initial writ application to raise a naked claim of ID, as he does now in his present—but *subsequent*—post-conviction writ application. Interestingly, Applicant *does* plainly raise the sufficiency issue now, in the second claim of his current subsequent writ application. This Court did not permit the lower court to proceed to a merits determination of the second claim, however—presumably because the claim was raised and rejected on direct appeal. *See* TEX. CODE CRIM. PROC. art. 11.071 § 5(c); *Ex parte Gallo*, No. WR-77,940-03, 2017 WL 562724 (Tex. Crim. App. Feb. 8, 2017) (not designated for publication).

Then, in November of 2016, the present subsequent application was submitted, this time with Applicant's permission. Now, in his first claim, and for the first time since his trial, Applicant brings a free-standing claim of ID. Also, in his third claim, he once again challenges the trial testimony of Dr. Denkowski, contending that it constituted false evidence. He argues that he may raise this third claim for the first time in this subsequent writ application based on a new legal development, occurring since he filed his initial writ application in 2007. Specifically, in *Ex parte Chabot*, this Court recognized—for the first time—that the State's unknowing use of false or misleading evidence may constitute a due process violation. 300 S.W.3d 768 (Tex. Crim. App. 2009); *see also* TEX. CODE CRIM. PROC. art. 11.071 § 5(a)(1) (permitting courts to address the merits of claims raised for the first time in a subsequent writ application if the legal basis for the claim was previously unavailable).

We remanded this subsequent writ application in February of 2017 to allow Applicant to litigate the merits of these two claims.[3] *Ex parte Gallo*, No. WR-77,940-03, 2017 WL 562724 (Tex. Crim. App. Feb. 8, 2017) (not designated for publication). At the behest of the parties, the convicting court has now entered findings of fact and conclusions of law, recommending that we grant relief on both claims. The convicting court would have us conclude that Applicant has established the

---

[3] When a convicting court receives a subsequent application for writ of habeas corpus in a capital case, it must immediately forward it to this Court, and it may not "take any further action" on that application unless and until this Court "issues an order finding that the requirements [for proceeding to the merits of the claims contained therein] have been satisfied." TEX. CODE CRIM. PROC. art. 11.071 §§ 5(b), (c).

diagnostic criteria for ID, under the *most recent* manual, the DSM-5-TR (which did not yet exist at the time Applicant filed this subsequent writ application, in 2016), by a preponderance of the evidence.

Today, the Court uncritically accepts the convicting court's recommendation that we conclude—*de novo*—that Applicant has established ID, under "the current, medically accepted diagnostic criteria" and "by a preponderance of the evidence[.]" Majority Opinion at 3. Based on that conclusion, the Court declares Applicant's third, *Chabot*-based claim, that Dr. Denkowski's testimony was false, to be moot. For the following reasons, I dissent to this disposition.

## II. WHY *DE NOVO* REVIEW UNDER ART. 11.071 § 5(a)(1)?

The Court remanded this subsequent writ application to the convicting court to consider both: (1) Applicant's false evidence claim, based upon Denkowski's trial testimony, and (2) his substantive ID claim. I joined that order. But in retrospect, it is not clear to me why we permitted consideration of the ID claim under Section 5(a)(1) of Article 11.071, which requires an applicant to allege a new factual or legal basis for the claim.[4]

I concede that Applicant alleged *new facts* relevant to his claim that *false evidence* may have led to his death sentence. These new facts include certain developments since Applicant filed his initial writ

---

[4] Section 5(a)(1) of Article 11.071 prohibits courts from even considering the merits of a claim unless the subsequent writ application "contains sufficient specific facts" to show that the claim could not have been raised in a previous writ application "because the factual or legal basis for the claim was unavailable" at the time the previous application was filed. TEX. CODE CRIM PROC. art. 11.071 § 5(a)(1).

application, in 2007, that seriously impugned Denkowski's methodology for assessing ID. Indeed, in 2011, Denkowski entered into an agreement with the relevant professional board "to not accept any engagement to perform forensic psychological services in the evaluation of subjects for mental retardation or intellectual disability in criminal proceedings." *Ex parte Gallo*, 2017 WL 562724, at *1; *Ex parte Gallo*, No. WR-77,940-01, 2013 WL 105277, at *1 (Tex. Crim. App. Jan. 9, 2013).

Applicant also alleged *new law* relevant to that same claim of *false evidence*. The new *legal* basis that Applicant alleged to satisfy Section 5(a)(1) of Article 11.071, was the issuance, in 2009, of this Court's opinion in *Chabot*, 300 S.W.3d at 771, which established the State's inadvertent use of false testimony as a viable due process claim.[5] So, I understand how the *new facts* alleged by Applicant might entitle him to a determination of his false evidence claim in a subsequent writ application, consistent with Section 5(a)(1), under the *new law* as explicated in *Chabot*.

But Applicant has alleged neither *new facts* nor *new law* that

---

[5] *See Ex parte Chavez*, 371 S.W.3d 200, 205 (Tex. Crim. App. 2012) (observing that "*Chabot* was the first case in which we explicitly recognized an unknowing-use due-process claim; therefore, that legal basis was unavailable at the time applicant filed his previous application"). In his concurring statement following the Court's denial of relief in Applicant's initial writ application, Judge Price practically invited Applicant to raise a false evidence claim in a subsequent writ application. *Ex parte Gallo*, 2017 WL 562724, at *3. But Judge Price said nothing about the possibility that Applicant could re-raise the substantive question of whether he was in fact intellectually disabled at the time of the offense, or whether the new facts showing Denkowski's false testimony somehow authorize this Court to embark upon a *de novo* determination of the issue of Applicant's ID in a subsequent post-conviction habeas corpus proceeding.

demonstrate the truth of his free-standing claim of ID. The Court should not allow itself to simply gloss over the distinction between a showing that a witness might have testified falsely about an issue and a showing that the correct resolution of the issue has been definitively demonstrated, one way or the other. It is at least unclear to me that the *new facts* impugning Denkowski's trial testimony should, by themselves, authorize us, under Section 5(a)(1), to conduct a *de novo* review of whether Applicant was ID at the time of his offense. And Applicant does not allege any *other new facts* that would justify re-addressing that issue even though it has already been determined by the jury at his trial.[6] Moreover, *Chabot* does not provide *new law* with respect to the substantive question whether Applicant was ID at the time he committed his offense. Therefore, the new-law exception to the prohibition against our addressing a claim that was or should have been raised previously does not apply to that substantive issue—at least not

---

[6] The exception to the general prohibition against subsequent writ applications that is embodied in Section 5(a)(1) is, after all, a claim-specific exception. *See* Tex. Code Crim. Proc. art. 11.071 § 5(a)(1) (requiring an applicant to show that "the current *claims* and *issues* have not been and could not have been presented previously" because "the factual or legal basis for *the claim*" was previously unavailable) (emphasis added). That an applicant can demonstrate new facts and/or new law relevant to one specific claim—for example, the unknowing use of false evidence, under *Chabot*—does not entitle him to also raise other claims that involve different legal questions and/or for which his new facts do not make out a prima facie case for relief. *See Ex parte Oranday-Garcia*, 410 S.W.3d 865, 868 (Tex. Crim. App. 2013) (recognizing that, under Section 5(a)(1) of Article 11.071, "a subsequent writ applicant must allege facts sufficient to make out at least a prima facie case for relief under whatever new law he is attempting to invoke").

based on *Chabot*.[7]

I now regret having joined the Court's 2017 order to the extent that it authorized the convicting court to address the merits of Applicant's first claim. *Ex parte Gallo*, 2017 WL 562724, at *1.[8]

### III. WHY A PREPONDERANCE STANDARD?

I presume that because the Court believes Applicant is properly proceeding on his free-standing ID claim under Section 5(a)(1), it measures the merits of that claim by a preponderance-of-the-evidence standard.[9] But because I now disagree that Applicant has alleged any relevant new law with respect to that claim, nor has he alleged new facts

---

[7] Because they were decided after Applicant filed this subsequent writ application in 2016, Applicant could not have invoked the subsequent United States Supreme Court decisions in *Moore v. Texas*, 581 U.S. 1 (2017), or *Moore v. Texas*, 586 U.S. ___, 139 S. Ct. 666 (2019). And while *Hall v. Florida*, 572 U.S. 701 (2014), had been decided, Applicant does not explicitly identify it as a new legal basis to conduct a *de novo* review of the issue of his ID, under Section 5(a)(1) of Article 11.071. Perhaps he may raise the issue in yet *another* subsequent writ application, but he has alleged no new legal basis for a *de novo* determination of ID in the present pleading.

[8] The Court has said that, even after it has remanded a subsequent writ application under Article 11.071, Section 5(c), for the convicting court to develop the facts, *see* note 3, *ante*, we remain at liberty to revisit the propriety of the remand once the case returns to us. *See Ex parte Hood*, 211 S.W.3d 767, 773 (Tex. Crim. App. 2007) ("If we determine that [the requirements of Section 5(a) of Article 11.071] are not met, we must dismiss the [subsequent] application, even if we had previously remanded the claim on the basis of an initial determination [under Section 5(c)] that the requirements had in fact been met.").

[9] After all, a subsequent capital habeas applicant who can show that his claim is predicated on new law or new facts that he could not have raised in an earlier writ application should not be bound to produce proof any greater than an initial habeas applicant ordinarily would, typically, a preponderance of the evidence. *E.g.*, *Ex parte Torres*, 483 S.W.3d 35, 43 (Tex. Crim. App. 2016).

that would necessarily authorize us to conduct a *de novo* review of anything more than the *Chabot*-based false-evidence claim, I am convinced that applying a preponderance standard is inappropriate.

Although Applicant raised ID at trial, he failed to raise it again as a substantive issue in his initial writ application. Without new law or compelling new facts to authorize Applicant to raise the issue in a subsequent writ, having failed to raise it in his initial writ application when he could have, it would seem that Applicant should have to satisfy Section 5(a)(3) of Article 11.071.[10] This Court has construed that provision to require a showing, by clear and convincing evidence, that "no rational jury would fail to find" an applicant to be ID. *Ex parte Blue*, 230 S.W.3d 151, 162 (Tex. Crim. App. 2007). It seems to me that, *if* the Court is going to entertain the merits of the free-standing ID claim at all, it should apply the *Blue* standard. And I am far from sure I believe Applicant has satisfied that standard, under any view of the case.

## IV. WHY THE DSM-5-TR?

The diagnostic manual with reference to which the United States Supreme Court first determined that execution of the mentally retarded violates the Eighth Amendment, in *Atkins*, was the DSM-IV-TR, which issued in 2000. That was still the current manual at the time of Applicant's trial, when the issue of his ID was first litigated. The DSM-

---

[10] Under Section 5(a)(3) of Article 11.071, in order to raise a claim in a subsequent writ application, an applicant must allege "sufficient specific facts" to show, "by clear and convincing evidence, [that,] but for a violation of the United States Constitution[,] no rational jury would have answered in the state's favor one or more of the special issues that were submitted to the jury" under the relevant statute governing capital punishment proceedings. TEX. CODE CRIM. PROC. art. 11.071 § 5(a)(3).

IV-TR was still the manual in effect when we determined that the evidence was factually sufficient to support the jury's ID verdict on direct appeal, in 2007. By the time Applicant filed this subsequent application, in 2016, however, the applicable diagnostic manual was the DSM-5, from 2013.

Today this Court determines that Applicant is intellectually disabled according to the diagnostic criteria from an even *more* recent manual, the DSM-5-TR, copyright date 2020. But as I have elsewhere argued:

> changes in the manuals should not be thought to automatically translate into a national consensus about the tolerance of the death penalty under the Eighth Amendment. Just because the professional consensus defining intellectual disability (if that is even what the manuals reflect[11]) has evolved, that does not *necessarily* mean that society's standard of decency pertaining to the propriety of the death penalty has evolved to the same extent. It seems to me that whether society's standard has also evolved remains to be determined, either by this Court or by the United States Supreme Court.

---

[11] The successive manuals may not even accurately reflect the consensus of the psychiatric profession *itself*, much less the consensus of society. It has recently been observed that "[e]ven seemingly small changes to the [DSM] manual ([e.g.], to symptomatology of previously included disorders) can have a substantial impact on increasing the number of people who would receive a diagnosis[,]" and thus "lead to overdiagnosis[.]" Lauren C. Davis, et al., *Undisclosed Financial Conflicts of Interest in DSM-5-TR: Cross Sectional Analysis* 384 BMJ 5 (2024), https://dx.doi.org/10.1136/bmj-2023-076902. For this Court to uncritically adopt the latest expression of the apparent consensus of the psychiatric community as to the appropriate diagnostic criteria for ID, overinclusive though that expression may be, constitutes an abdication of the Court's judicial role, as required by the United States Supreme Court, to determine the consensus of American society with respect to who may and may not be executed for a capital crime consistent with the Eighth Amendment.

*Ex parte Long*, 670 S.W.3d 685, 686 (Tex. Crim. App. 2023) (Yeary, J., dissenting) (citing *Ex parte Segundo*, 663 S.W.3d 705, 712−15 (Tex. Crim. App. 2022) (Yeary, J., dissenting)).[12] It is not at all clear to me that a diagnosis of ID under the most recent manual necessarily means that the death penalty is constitutionally unacceptable.

### V. WHY NOT RESOLVE THE FALSE EVIDENCE CLAIM?

This Court has occasionally conducted a *de novo* resolution of the issue of ID in post-*Atkins* cases in which the issue was first resolved by a jury at the trial level. I have long urged the Court to explicitly determine whether the proper disposition of such post-*Atkins*-tried habeas cases ought to be "to remand the case to the convicting court for,

---

[12] Moreover, at a certain point, this endless revisiting of the same issue becomes simply intolerable. Suppose a capital defendant were to raise ID at trial, and that all of the expert testimony at trial with respect to ID was predicated on the then-current version of the DSM—let's say, the DSM-IV-TR. Suppose that the jury rejected the defendant's ID claim. Suppose, then, that on appeal the defendant argued that the jury's rejection of his ID claim was against the great weight and preponderance of the evidence. Suppose, also, that during the interim between trial and appeal, a new diagnostic manual issued—the DSM-5. Which diagnostic manual should this Court then rely on in making the appellate determination whether the jury verdict was against the great weight and preponderance of the evidence?

Suppose, finally, that the defendant were to bring a claim in his initial post-conviction writ application, asking this Court to re-determine the question of his ID *de novo*, and that by this time the DSM-5-TR has come out: Should the Court even entertain such a claim, and if so, must we apply the DSM-5-TR? Will we have to once again re-examine the ID issue, *de novo*, in a subsequent writ application whenever the DSM-6 comes out? And then again when the DSM-6-TR issues? When will it end? As I observed in *Segundo*, "it violates at least the spirit, if not the letter, of Article 11.071's abuse-of-the-writ principle to permit this kind of serial litigation—rehashing the *same* issue, over and over—before the State may carry out its otherwise legitimately obtained judgment." 663 S.W.3d at 716 (Yeary, J., dissenting).

if not an altogether new punishment hearing before a jury, at least another jury determination of the ID issue[.]" *Ex parte Lizcano*, 607 S.W.3d 339, 341 (Tex. Crim. App. 2020) (Yeary, J., dissenting). *See also Segundo*, 663 S.W.3d at 711−12 (Yeary, J. dissenting); *Long*, 670 S.W.3d at 686 (Yeary, J. dissenting). The Court continues to avoid addressing this question.

Were the Court today to limit its consideration to the merits of Applicant's third claim—the *Chabot*-based false evidence claim—and then go on to grant relief on that basis, I presume this would be exactly the way it would dispose of the case: to send it back to the trial court for a new punishment hearing (or at least a new hearing to resolve the ID claim) in the trial court,[13] unpolluted by the alleged false evidence. *Ex parte Ghahremani*, 332 S.W.3d 470, 483 (Tex. Crim. App. 2011). In my view, the Court *should* limit its review of this subsequent writ application to Applicant's third claim and, in the event that it should

---

[13] In *Lizcano* I observed:

> The procedures governing the determination of the ID issue at trial remain wholly court fashioned. Despite our most earnest entreaties, the Texas Legislature has yet to produce any legislative guidance. *See In re Allen*, 462 S.W.3d 74, 53−54 (Tex. Crim. App. 2015) ("In terms of issues surrounding intellectual disability, we still find ourselves in the same 'interregnum' that existed in 2004. * * * We now make explicit what we before expressed only tacitly: Legislation is required.") In the absence of legislative guidance, perhaps this Court would be free to remand the cause, not for an entirely new punishment proceeding under [TEX. CODE CRIM. PROC. Article] 44.29(c), but for a new jury determination of the ID issue.

607 S.W.3d at 341 n.7.

determine that claim to have merit, remand to the trial court for further proceedings.

## VI. CONCLUSION

In brief, the Court mistakenly addresses the merits of Applicant's free-standing ID claim and employs the wrong standard, as well as the wrong diagnostic manual, to resolve that claim. What it should do instead is to simply address Applicant's *Chabot*-based false evidence claim and, if it should find merit there, remand his case for a new ID hearing in the trial court. Otherwise, the Court should deny relief. Because the Court instead—once again—simply grants relief, without taking adequate account of the continually evolving standards for diagnosing intellectual disability or paying heed to the history and procedural posture of the case, I respectfully dissent.

**FILED:**                                             April 17, 2024
**PUBLISH**